PEDRO RODRIGUEZ, *alias* POLONIO BALDERAS, *v.* THE STATE.

1. MURDER — CIRCUMSTANTIAL EVIDENCE. — To warrant a conviction on circumstantial evidence, each fact necessary to the conclusion of guilt must be proved by competent evidence, beyond a reasonable doubt; all the facts must be consistent with each other and with the main fact to be proved; and the circumstances, taken together, must be of a conclusive nature, leading to a satisfactory conclusion, and producing a reasonable and moral certainty that the accused, and no other, committed the offence; and these circumstances should not only be consistent with the guilt of the accused, but inconsistent with any other rational conclusion or reasonable hypothesis consistent with the facts proven. Note such evidence held insufficient to sustain a conviction for murder in the second degree.

2. EVIDENCE. — The rule excludes such evidence as implies that better evidence exists, and is withheld or not accounted for, but does not demand the *greatest amount* procurable.

APPEAL from the District Court of Bexar. Tried below before the Hon. G. H. NOONAN.

Under an indictment for the murder of Dimas Muños, on April 9, 1878, in Bexar County, the appellant was convicted of murder in the second degree, and his punishment assessed at twenty years in the penitentiary. The conviction was had upon purely circumstantial evidence, a *résumé* of which is given below.

S. A. Purinton, for the State, testified that he is a sheep-

raiser, residing at Cuiliebre Springs, in Bexar County, and, as such, had deceased in his employ as a herder at the time of his death. Deceased slept at night in a tent, about one and a-half miles from the road which, passing witness's house, leads off from the main Bandera Road to Castroville. The last time witness saw deceased alive was on or about April 1, 1878. Defendant came to witness's house on April 4, and said that deceased had sent him to witness for a horse to ride to San Antonio, to see his (the deceased's) wife, who was sick. Louis Sanchez interpreted for defendant and the witness. In the evening of the same day, defendant brought the horse back, saying that deceased could not ride to San Antonio, as he had a stiff knee, from rheumatism. On the morning of the next day, the 5th, defendant came to witness's house, and, through the same interpreter, said that the deceased had sent defendant to witness for $4 of his wages, to send to his (deceased's) wife, in San Antonio. Witness rather suspected something wrong; but defendant, being with Sanchez, induced him to give him the $4. Deceased had worked for witness for some time, and had never been seen by witness with arms.

On April 11, 1878, witness, discovering the herd of sheep of which deceased had charge grazing towards his house, went out to meet them, supposing that deceased wanted something. He found no herder with them, though he called; and then galloped over to the tent of deceased, where he found him dead, and his body in a state of decomposition. An abrasion or wound back of the right ear had been fly-blown, and was infested by maggots.

On cross-examination, the witness says that defendant was at his house on the 4th and 5th days of April, as detailed above. The road passing witness's house is not the main Castroville or Bandera Road, but one connecting them, and people pass on it frequently, but witness does not

remember seeing any one passing on it between the 5th and 11th of last April. There are also in the neighborhood some hay-roads, and a road used by neighbors, the latter of which is sometimes travelled by people. Witness sometimes has visitors, but can recall no other one at his house between the 5th and 11th of April than defendant. Has four sheep-herders in his employ, three of whom, at the time of the killing, were herding near his house. Witness examined the body of deceased, and found four — it might have been six — bullet wounds in his body. The body was much decayed, swollen, and offensive to smell.

Louis Sanchez, for the State, swears that he saw defendant on the two days he came to Purinton's house, and interpreted for the two. Defendant came the first day for a horse, as he said, at the instance of deceased, and for the use of deceased; and came the next day, he said, at the instance of deceased, for $4, for the family of deceased. Witness has never seen Ildefonso Rodriguez, that he knows of.

On cross-examination, he says that he never saw the defendant before he came to Purinton's the first time, for the horse. Doesn't recollect how long afterwards it was he came for the money. Witness saw deceased alive one day before defendant came to Purinton's house the first time, after which time he has never seen deceased alive.

Ildefonso Rodriguez, for the State, swears that about two months prior to the present term of court (June, 1878) he went with defendant to the other side of Cuiliebre Creek, stopping, the second night out, about one-half mile from the creek. In a few minutes the defendant got up and went off, leaving witness there, and telling him he would be back after a while. Witness went to sleep for about one-quarter of an hour. After a while he heard four shots, and presently defendant came in from the direction he went, bringing a tin-cup of water and a frying-pan of beans, cooked.

He had none of these things when he went away. After the beans were eaten, defendant told witness they must go. Witness cannot say how far off the shots were. After defendant said they had to go, they went to the San Geronimo rock wall, four or five miles off. Nothing was said about the shots until witness asked defendant, as he was scared about them. Witness was told by defendant not to fear; that it was only some man firing his pistol. After witness and defendant left the San Geronimo, they went towards Fredericksburg. They intended to go to Bandera, but, after the shots, turned to Fredericksburg. Witness recognized a belt here shown him as one the defendant brought to his house in San Antonio, and that was worn by defendant on their trip. Witness saw a pistol in the belt during the trip; defendant had it the night of the shooting, and witness did not see that he left it at the camp when he went off, and came back with the beans. Would have seen it had it been left in camp. Witness is unable to state whether or not the pistol was loaded when the defendant went from camp, but thinks one cartridge was gone when he came back. Defendant stayed at the house of witness when in San Antonio; came from Monterey about six months before the shooting, and is not related to witness. When they camped on Cuiliebre Creek, the second night out (the night of the shooting), it was about seven o'clock. Witness heard the shots between ten and eleven o'clock.

Cross-examined, the witness said that the shots did not come from the direction taken by the defendant. Witness saw no horse-hunters, nor did defendant tell him that horse-hunters gave him the pan of beans. Witness had nothing but a small yellow sack when they started, and defendant nothing.

Phil Shardien, a detective, for the State, identified the belt as one he got at the house where defendant had stayed, and the last witness as the boy he saw there on that occa-

sion. On cross-examination, he is not positive about the boy, but his size and appearance is the same.

Juana Esparza, mother of the witness Rodriguez, for the State, says that the defendant has been staying at her house, in San Antonio, when he returned from trips over the country. She has known the defendant for about a year. About five or six days before defendant was arrested, defendant and her son left her house, going she knew not where, nor for what purpose, and carrying nothing. Neither carried anything off, — that is, no blankets; no tin-cups, no frying-pan, no sacks, yellow or other color, — and brought none back. Defendant told witness when he got back that he had pawned a pistol at Carlos Guerguin's.

S. F. Miles, for the State, swears that he is half-owner with Purinton of the sheep stock spoken of. He saw defendant at the camp of deceased on the night of April 3d. Witness again saw defendant at Purinton's on April 4th and 5th, and details again, in substance, the testimony of Purinton and Sanchez. Defendant wore a six-shooter on each occasion, and witness examined it at Purinton's, and would know it. The belt looks like the one the defendant had on. On the night of the 3d, when witness saw defendant at the camp of deceased, he met him (defendant) coming out of the tent with deceased, when deceased told witness that here was a man who would herd for him while he (deceased) went to San Antonio. Witness knows the articles deceased had in his tent, as they were furnished by witness and his partner. He had a large frying-pan, two tin-cups, a coffee-pot, some knives and forks, and a small bag, with both ends closed and a slit opening in the middle. Witness saw the deceased alive on the evening of the 5th for the last time. When he went to gather up deceased's things, he found that all the beans, sugar, and coffee, one of the tin-cups, and the frying-pan were gone. The firing of a pistol could not be heard from the deceased's camp to Purinton's,

on account of obstructing hills and timber. When deceased's body was removed, witness found one dollar and thirty cents in silver and a five-dollar currency bill, which he (witness) had paid deceased on March 14 preceding.

Ildefonso Rodriguez, recalled for the State, says that he pawned defendant's pistol for defendant, at Carlos Guerguin's, the morning of their return to San Antonio. Witness took no small yellow sack with him when he started, — only five cents and a small blanket. Again, he swears that he only carried a towel and bread, to which his mother had sworn.

S. A. Purinton, recalled, says that the money he paid defendant for deceased was four dollars, in American halves, and the money found under deceased was money paid him in March, — five in currency, one Mexican dollar, one quarter, and one nickel.

In behalf of the defendant, it was admitted that A. T. Beauregard would swear, if present, that he had known the defendant for five years, and had always known him as a peaceful, quiet, and industrious citizen.

No brief for the appellant.

*George McCormick,* Assistant Attorney-General, for the State.

WHITE, J.    Appellant in this case was indicted for the murder of Dimas Muños; was tried and convicted of murder in the second degree, and his punishment assessed at twenty years' imprisonment in the State penitentiary. Many interesting questions were raised during the progress of the trial, a discussion of which is not deemed necessary to a decision of the case on this appeal, and which are not likely to arise on a subsequent trial.

To our minds, the only important question to be consid-

ered is whether the evidence, as shown by the statement of facts in the record, is sufficient to uphold the verdict and judgment. Directing our attention principally to a solution of this question, we have sifted out and arranged, in regular and connected order of detail, all the inculpatory facts involving this defendant in the murder, as charged in the indictment to have been committed by him, and then have applied to these facts the law applicable to the case as thus made.

The case is one entirely of circumstantial evidence. The doctrine with regard to the conclusiveness and effect of this character of testimony seems now to be well settled in this State. In *Hampton* v. *The State*, 1 Texas Ct. App. 652, this court quoted, with approval, the rule laid down in *The Commonwealth* v. *Webster*, 5 Cush. 296, as follows:

"In order to warrant a conviction of crime on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by competent evidence, beyond a reasonable doubt; all the facts must be consistent with each other and with the main fact sought to be proved; and the circumstances, taken together, must be of a conclusive nature, and leading, upon the whole, to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused, and no other person, committed the offence charged." 3 Greenl. on Ev., sec. 29, and note.

In *Williams* v. *The State*, 41 Texas, 209, our Supreme Court held that, " to authorize a conviction on circumstantial evidence, the circumstances should not only be consistent with the prisoner's guilt, but inconsistent with any other rational conclusion or reasonable hypothesis consistent with the facts proven."

We do not believe that the evidence, as disclosed in the record before us, brings this case up to the standard of the rules thus laid down. It lacks such a satisfactory conclu-

siveness and moral certainty of the guilt of the defendant " as would render it safe to allow the verdict to stand and become a precedent in the adjudication of offences under the law." *Tollet* v. *The State*, 44 Texas, 95 ; *King* v. *The State*, 4 Texas Ct. App. 256 ; *Jones* v. *The State*, 4 Texas Ct. App. 437.

Besides this objection to the testimony, the evidence adduced to establish some of the main facts in the case presupposes the existence of other and better evidence of those facts, which should have been produced, or a failure to do so reasonably accounted for. *Porter* v. *The State*, 1 Texas Ct. App. 394. As an instance illustrating this objection to the evidence, we see that it is shown that accused received from Purinton $4, on pretence that the deceased wished him to take the same to his wife, in San Antonio. Now, if the State proposed by this evidence to establish a motive on the part of defendant to kill deceased, she should have gone further, and have shown by the wife of deceased that defendant never paid her the money.

Because the evidence is not sufficient to sustain the verdict and judgment, and because, therefore, the court erred in overruling defendant's motion for a new trial, the judgment below is reversed and the cause remanded.

*Reversed and remanded.*